### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

DIRENZO TOWING & RECOVERY, INC.,

        Plaintiff,

    v.

OWNER-OPERATOR INDEPENDENT
DRIVERS ASSOCIATION, INC., OWNER-
OPERATOR SERVICES, INC., and OOIDA
RISK RETENTION GROUP, INC.,

        Defendants.

**CIVIL ACTION**

**NO. 4:16-cv-10073-TSH**

### REPORT AND RECOMMENDATION

**March 9, 2018**

Hennessy, M.J.

      This action currently addresses the extent of liability coverage under an insurance policy.

Plaintiff/counterclaim defendant Direnzo Towing and Recovery, Inc. ("Direnzo") seeks to reach

and apply insurance proceeds from Defendant/counterclaimant OOIDA Risk Retention Group,

Inc. ("RRG"), Defendant Owner-Operator Independent Drivers Association, Inc. ("OOIDA"),

and Defendant Owner-Operator Services, Inc. ("OOSI") for towing, recovery, storage, and

remediation services Direnzo allegedly provided in connection with a February 2014 motor

vehicle accident involving Defendants' insured, Kings Trucking Corp. ("Kings"). See generally

Docket #1-1.  Direnzo obtained a default judgment against Kings in Worcester County Superior

Court in the amount of $167,700.95 plus interest and costs.  See id. at ¶¶ 46-51; Docket #14 at 2.

The parties have advanced competing declaratory judgment claims seeking to resolve whether an

insurance contract between one or more of the defendants and Kings ("the insurance contract" or

"the insurance policy") requires that one or more of the defendants provide indemnity in this action.[1]  See Docket #1-1 at 13-14 (Direnzo's claim); Docket #7 at 10-15 (RRG's counterclaim). Direnzo also has advanced non-declaratory claims; but per District Judge Hillman's scheduling order, those other claims are not before the Court.  See Docket #26.

District Judge Hillman has referred Defendants' motion for summary judgment, Docket #49, to me for a report and recommendation.  See Docket #69 (order of reference).  Defendants do not specify whether they seek summary judgment on Direnzo's declaratory claim, their own declaratory cross-claim, or both, but they do request "a judgment in their favor that they have no duty to indemnify Direnzo" for Direnzo's claims against Kings.  See Docket #49.  Direnzo has opposed the motion, see Docket #70, and Defendants have submitted a reply, see Docket #75.  In Direnzo's opposition brief, Direnzo requests "[i]n addition, or in the alternative," that the Court declare Direnzo is entitled to payment from one or more of the defendants.  Docket #70 at 21.

In light of the parties' submissions, and for the reasons that follow, I find that the insurance contract covers most, but not all, of Direnzo's costs.  I further find that Defendants' motion is premature as to Direnzo's Reach and Apply claims, Chapter 93A claim, and claims against OOSI and OOIDA.  I therefore RECOMMEND that Defendants' motion be GRANTED IN PART AND DENIED IN PART as set forth below.

I.      BACKGROUND

Unless otherwise noted, the following facts in the summary judgment record are not in dispute.

---

[1] Defendants seek summary dismissal of Direnzo's claims against OOSI and OOIDA, arguing that OOSI and OOIDA are not parties to the insurance contract.  As set forth below, I recommend that the Court deny this portion of Defendants' motion.  See infra section III.E.

A.      The Insurance Policy

RRG, an insurer, issued commercial automobile liability insurance policy number PL199515386A (the "policy" or the "insurance contract") to Kings, effective from October 26, 2013 through October 26, 2014.  PSOF at 2; DSOF ¶ 1.[2]  RRG and Direnzo have no contractual relationship, nor has Kings assigned Direnzo any contractual rights.  PSOF at 3-4; DSOF ¶¶ 26-27.  The parties dispute whether OOSI and OOIDA were parties to the insurance contract, but they agree that RRG issued Kings's policy.

A copy of the policy is in the record.[3]  In relevant part, the policy provided coverage for "all sums an 'insured' legally must pay as damages because of . . . 'property damage' to which this insurance applies caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'. [sic]"  Docket #75-3 at 5; see PSOF at 2; DSOF ¶ 1.  "'Property damage' means damage to or loss of use of tangible property."  Docket #75-3 at 18.

The policy imposed certain duties on Kings in the event of an accident, claim, suit, or loss.  Among these, if Kings sustained "a 'loss' to a covered 'auto' or its equipment," Kings was required to "[t]ake all reasonable steps to protect the covered 'auto' from further damage" and to "keep a record of [its] reasonable expenses for consideration in the settlement of the claim."  Docket #75-3 at 10-11.  However, an adjacent provision prohibited Kings from assuming any obligation, making any payment, or incurring any expenses "without [the insurer's] prior written consent, except at the 'insured's' own cost."  Id.

---

[2] References to "PSOF" refer to the Statement of Facts included in Plaintiff's opposition brief.  See Docket #70 at 2-4.  References to "DSOF" refer to the Statement of Facts set forth in Defendants' opening brief.  See Docket #50 at 2-7.

[3] Defendants appended a copy of the policy to their reply brief, in which they explain that they inadvertently failed to submit it with their opening brief.  See Docket #75 at 1.  Defendants aver that they produced a copy of the policy to Direnzo in discovery on May 26, 2017, around two months before this motion was filed.  Id. at 2.

The policy also contained an endorsement known as Form MCS-90 (the "MCS-90 endorsement").  PSOF at 3; DSOF ¶ 24.  That endorsement provided, again in relevant part,

> [T]he insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 . . . .  It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described.

Docket #75-3 at 1; see PSOF at 3; DSOF ¶ 24.  The MCS-90 endorsement defined "Public Liability" as "liability for bodily injury, property damage, and environmental restoration." Docket #75-3 at 1.

Separate from these grants of coverage, the policy also contained several exclusions relevant to this motion.  One, labeled the "contractual" exclusion, disclaimed "[l]iability assumed under any contract or agreement"; but this exclusion did not apply to liability that the insured "would have in the absence of the contract or agreement."  Id. at 7.  A second provision, labeled the "care, custody or control" exclusion, barred coverage for "'property damage' to or 'covered pollution cost or expense' involving property owned or transported by the 'insured' or [in] the 'insured's' care custody or control."  Id. at 8.  And provision labeled "no benefit to bailee" stated that the insurer "will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form."  Id. at 12.  "Property" is not defined in the insurance contract.

B.      The Motor Vehicle Accident

On February 28, 2014, a tractor-trailer owned by Kings crashed while travelling eastbound at Exit 11 of Interstate 290 in Worcester, Massachusetts.  PSOF at 2; DSOF ¶ 6; see

4

Docket #72 at 3.  While the record does not resolve what caused the accident, a police report stated that the vehicle's driver contributed to the accident by being "[f]atigued/asleep."[4]  Docket #72 at 1.  At the request of the Worcester Police Department, see Docket #7-2 ¶ 3 (an affidavit by Direnzo's president submitted by Defendants in support of the instant motion), Direnzo dispatched workers to the accident scene and provided towing, recovery, storage, and remediation services, PSOF at 2; DSOF ¶ 7.

Direnzo's workers observed significant damage at the accident scene.  Kings's tractor-trailer appeared to have breached a guard rail, run down a slope between the highway and its off-ramp, and crashed onto Southbridge Street.  Docket #50-1 at 32 (Direnzo's report on its response to the accident, appended to Direnzo's state-court complaint in this action).  The tractor and trailer had separated, turned over, and sustained heavy damage, with parts, including the vehicle's front axle, broken off and lying on Southbridge Street.  Id.  The trailer's brakes were locked in the park position.  Id. at 33.  Containers of orange juice were ejected from the cargo trailer, littered the scene, and leaked onto the roadway, as did gasoline, engine oil, antifreeze coolant, and battery acid from the vehicle.  Id. at 32.  The orange juice froze onto the road surface due to severely cold weather.  Id.  A street light was shorn from its mountings, resulting in exposed live powerlines that rested on the same location as the trailer.  Id. at 32.  A guardrail and multiple crash attenuating barrels also were damaged.  Docket #72 at 3.  A police report described the tractor-trailer as a "total loss."  Id.

Direnzo remediated these conditions and recovered the tractor-trailer.  See Docket # 50-1 at 32-33.  Its workers used "Speedy dry" to contain the fluid leaks.  Id. at 32.  They drained fuel tanks on the damaged vehicle and disconnected and removed the leaking batteries.  Id.  They

---

[4] The driver sustained incapacitating but non-fatal injuries and was transported by ambulance to a local hospital. Docket #72 at 3.

then set about clearing the wreckage from the scene, which required the use of winches and other heavy machinery.  Id. at 33.  They arranged for the streetlight's power source to be cut off in order to safely recover the trailer.  Id. at 32-33.  The also had to cage the trailer's breaks and remove a break canister before the trailer could be towed.  Id. at 33.  The trailer's roof had to be removed to ensure it would not fall from Direnzo's tow truck while the trailer was in transit to Direnzo's facility.  Id.  Aside from a damaged recovery strap, Direnzo did not suffer any damage to its own property.  PSOF at 2; DSOF ¶ 7-8; see Docket #50-1 at 33.  It eventually towed Kings's tractor-trailer from the accident scene to a secure facility.  PSOF at 2; DSOF ¶ 7-8.

The record includes an invoice from Direnzo to Kings evidencing that at the accident scene Direnzo performed services valued at approximately seventy-six thousand dollars.  See Docket #50-1 at 31.  Interest accumulated on the costs Direnzo incurred, and Direnzo also charged Kings three hundred dollars per day for the ongoing storage of Kings's tractor-trailer at Direnzo's facility.  See Docket #12 at 4; Docket #50 at 10 n.3.

C.     Procedural History

In July 2014, Direnzo sued Kings, Tropicana Products, Inc., and Sargent Trucking LLC in Worcester Superior Court for payment for the costs it incurred to tow, recover, and store Kings's tractor-trailer and to remediate the accident scene.  PSOF at 3; DSOF ¶ 10.[5]  Direnzo's claims in that action sounded in contract and quasi-contract and comprised counts of unjust enrichment, breach of contract, quantum meruit, breach of the covenant of good faith and fair dealing, and violation of Massachusetts General Laws Chapter 93A.  PSOF at 3; DSOF ¶¶ 11-12.  In December 2014, on Direnzo's motion, Kings was defaulted.  PSOF at 3; DSOF ¶ 13.  An

---

[5] According to Direnzo, Kings was hauling Tropicana's cargo at the time of the accident, and Sargent Trucking brokered the shipment.  DSOF ¶ 10 n.1.  Direnzo's claims against Tropicana and Sargent Trucking in Worcester Superior Court are stayed pending resolution of this case.  Id.

"Affidavit as to Damages" in support of Direnzo's motion for default stated that Kings's final balance to Direnzo totaled $167,700.95.  PSOF at 3; DSOF ¶ 14.  Direnzo's motion for assessment of damages against Kings described that amount as a "sum certain" evidenced by an invoice itemizing the services Direnzo performed.  PSOF at 3; DSOF ¶ 15.

In July 2015, the Superior Court allowed Direnzo's motion for assessment of damages on Direnzo's claims for unjust enrichment, quantum meruit, breach of contract, and breach of the covenant of good faith and fair dealing.  PSOF at 3; DSOF ¶ 17.  The court awarded Direnzo "the single amount of $167,700.95 together with interest and costs," as reflected in Direnzo's invoice to Kings.  PSOF at 3; DSOF ¶ 17.  The court did not award judgment on Direnzo's Chapter 93A claim.

Direnzo initiated the instant action by suing Defendants in Worcester Superior Court in November 2015, seeking damages under a variety of theories as well as declaratory relief establishing that Defendants' insurance contract with Kings requires Defendants to provide indemnity.  See Docket #12 at 2-15.  Defendants removed the action to this Court two months later, see Docket #1 at 1, and RRG then advanced a counterclaim seeking a declaratory judgment of no coverage for Direnzo's alleged damages, see Docket #7 at 10-16.  In response, Direnzo unsuccessfully moved to dismiss RRG's counterclaim.  See Docket #19; Docket #26.  In his order denying dismissal, District Judge Hillman instructed the parties to proceed with discovery only as required to prosecute motions for summary judgment on their declaratory judgment claims.  Docket #26.  That order remains in effect: discovery respecting Direnzo's non-declaratory claims has not taken place.

Defendants filed the instant motion on July 25, 2017, Docket #49, together with a supporting memorandum, Docket #50, and affidavit, Docket #51.  Direnzo submitted an

opposition with supporting exhibits on November 3, 2017.  Docket #70.  And Defendants filed a

reply brief with additional exhibits on November 30, 2017.  Docket #75.

II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  Once a party properly supports its motion for summary judgment, the burden

then shifts to the non-movant, who "may not rest on mere allegations or denials of his pleading,

but must set forth specific facts showing there is a genuine issue for trial."  Barbour v. Dynamics

Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 256 (1986)).  Moreover, the Court is "obliged to []view the record in the light most

favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's

favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  In so doing, the Court

must ignore mere "conclusory allegations, improbable inferences, and unsupported speculation."

Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).  If the

summary judgment movant "has had an adequate opportunity to show that there is a genuine

issue and that his opponent is not entitled to judgment as a matter of law," the Court may enter

summary judgment in the non-movant's favor sua sponte.  Nat'l Expositions, Inc. v. Crowley

Maritime Corp., 824 F.2d 131, 133-34 (1st Cir. 1987) (quoting 10A C. Wright, A. Miller & M.

Kane, Federal Practice and Procedure § 2720, at 34 (1983)) (emphasis omitted) (collecting

cases); see Fed. R. Civ. P. 56(f)(1).

"The interpretation of an insurance contract and the application of policy language to

known facts present questions of law for the judge to decide."  OneBeacon Am. Ins. Co. v.

Commercial Union Assurance Co. of Can., 684 F.3d 237, 242 (1st Cir. 2012) (citations omitted);

accord New Fed. Mortg. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 543 F.3d 7, 11 (1st Cir. 2008) (applying Massachusetts law).  The Court must assign the insurance contract's terms their ordinary meanings and "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Gandor v. Torus Nat'l Ins. Co., 140 F. Supp. 3d 141, 144-45 (D. Mass 2015) (quoting A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund, 838 N.E.2d 1237, 1250 (Mass. 2005)) (citing Finn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 896 N.E.2d 1272, 1277 (Mass. 2008)).  "Under Massachusetts law, the insured bears the burden of demonstrating that a claim falls within a policy's affirmative grant of coverage." OneBeacon Am. Ins. Co., 684 F.3d at 242 (citing Markline Co. v. Travelers Ins. Co., 424 N.E.2d 464, 465 (Mass. 1981)).  Conversely, "[i]t is the insurer's burden to show the applicability of a particular exclusion." New Fed. Mortg. Corp., 543 F.3d at 11 (citing Hanover Ins. Co. v. Talhouni, 604 N.E.2d 689, 692 (Mass. 1992)).

Massachusetts law generally requires that an ambiguity in an insurance contract be construed against the drafter, which invariably is the insurer.  E.g., Utica Mut. Ins. Co. v. Herbert H. Landy Ins. Agency, Inc., 820 F.3d 36, 42 (1st Cir. 2016) (quoting Metropolitan Prop. & Cas. Ins. Co. v. Morrison, 951 N.E.2d 662, 671 (Mass. 2011)).  This principle applies in full measure to actions, like this one, in which a non-party to an insurance contract seeks recovery directly from an insurer pursuant to Massachusetts's "reach and apply" statute.[6]  See, e.g., Bagley v. Monticello Ins. Co., 720 N.E.2d 813, 816 n.2 (Mass. 1999) (quoting Barnstable County Mut. Fire Ins. Co. v. Lally, 373 N.E.2d 966, 968 (Mass. 1978)); Bulyga v. Underwriters at Lloyd's, London, 297 N.E.2d 68, 70 (Mass. App. Ct. 1973) (citations omitted).  However, when "specific policy language is controlled by statute or prescribed by another authority," ambiguities are not

---

[6] See Mass. Gen. Laws ch. 214, § 3(9) (2017).

automatically resolved in favor of the insured.  <u>Utica Mut. Ins. Co. v. Herbert H. Landy Ins.</u>
<u>Agency, Inc.</u>, 820 F.3d 36, 42 (1st Cir. 2016) (quoting <u>Mass. Insurers Insolvency Fund. v. Smith</u>,
458 Mass. 561, 565 (2010)); <u>see</u> <u>Cardin v. Royal Ins. Co. of Am.</u>, 476 N.E.2d 200, 203 (Mass.
1985).

III.    ANALYSIS

    A.    Defendants' Choice-of-Law Argument is Waived

As an initial matter, Defendants argue in their reply brief that New Jersey law, not
Massachusetts law, should govern the interpretation of the insurance contract.  <u>See</u> Docket #75 at
6-9.  I find that Defendants have waived this choice-of-law argument by failing to assert it in
their opening brief.  <u>See</u> <u>Butler v. Deutsche Bank Trust. Co. Ams.</u>, 748 F.3d 28, 36-37 (1st Cir.
2014) (collecting cases) (noting that choice-of-law arguments are waived if "not timely presented
before the district court"); <u>see also</u> <u>Gov't Emps. Ins. Co. v. Barron Chiropractic & Rehab., P.C.</u>,
No. 1:16-cv-10642-ADB, 2017 WL 3526255, at *15 n.13 (D. Mass. Aug. 16, 2017) (citing
<u>NExTT Sols., LLC v. XOS Techs., Inc.</u>, 113 F. Supp. 3d 450, 458 (D. Mass. 2015))
("[A]rguments raised for the first time in the reply brief are considered waived.").  I also note
that until Defendants submitted their reply on the instant motion, both sides operated under the
presumption that Massachusetts law governs in this case.  <u>See</u> Docket #68 at 4 n.2.  Indeed,
Defendants' opening brief in support of this motion relies on Massachusetts law and offers no
suggestion that New Jersey law should apply instead.  <u>See generally</u> Docket #50.  I therefore will
apply Massachusetts law in this Report and Recommendation.  <u>Cf.</u> <u>OneBeacon Am. Ins. Co.</u>, 684
F.3d at 241 (quoting <u>Artuso v. Vertex Pharms., Inc.</u>, 637 F.3d 1, 5 (1st Cir. 2011)) (applying
Massachusetts law because the parties did so in their legal arguments and noting that "[a]

diversity court is free to honor the parties' reasonable agreement regarding which state's law applies").

Having resolved this preliminary question, I now address whether the insurance contract covers Direnzo's claims.

### B.       Direnzo's Declaratory Claim

Defendants seek a judgment establishing that the insurance contract does not cover Direnzo's costs.  I begin by addressing the underlying insurance policy, first by analyzing its "property damage" clause and then by discussing various exclusions and conditions it contains.  I then turn to the MCS-90 endorsement appended to the policy.

> 1.       The "Property Damage" Clause Covers Direnzo's Damages for Costs for Towing, Remediation, and Recovery, but Not for Storing Kings's Tractor-Trailer

The insurance contract provides coverage for "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies[7] caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'. [sic]" Docket #75-3 at 5.  The parties dispute whether this language covers the costs Direnzo incurred as a result of the accident.

Defendants' opening brief argues that "[r]ecovery, towing, and storage services do not constitute 'property damage,'" and urges that Direnzo's remedy lies against Kings rather than Kings's insurer.  See Docket #50 at 10-12.  In opposition, Direnzo points to several Massachusetts cases holding that insurance policies for "property damage" cover remediation of

---

[7] "[T]he qualifying phrase 'to which this insurance applies' . . . 'underscor[es] the basic notion that the premium paid by the insured does not buy coverage for all property damage but only for the type of damage provided for in the policy.'"  Friel Luxury Home Const., Inc. v. ProBuilders Specialty Ins. Co. RRG, No. 09-cv-10036-DPW, 2009 WL 5227893, at *4 (D. Mass. 2009) (quoting Am. Home Assur. Co. v. Libbey-Owens-Ford Co., 786 F.2d 22, 27 (1st Cir. 1986)) (applying Massachusetts law).

damage to the property of a third party.  <u>See</u> Docket #70 at 11-13.  Defendants argue in reply that the contract's phrase "legally must pay as damages" applies only to tort liability, not liability arising by contract.  <u>See</u> Docket #75 at 2-3.

I find that Massachusetts precedent supports Direnzo's position that the policy language providing coverage for "all sums an 'insured' legally must pay as damages because of . . . 'property damage'" covers Direnzo's damages for costs it incurred to remediate the accident scene and to recover and tow Kings's tractor-trailer.  Three Massachusetts cases, cited in both parties' briefs, support this conclusion.

First, in <u>Big Wheel Truck Sales, Inc. v. Buerman</u>, Civ. No. 2005-1143 (Mass. Super. Ct. Dec. 27, 2007), available at docket number 70-3, the Massachusetts Superior Court found coverage on facts similar to the instant case.  There, as here, the insurance policy covered "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies."  Docket #70-3 at 6.  The insured's truck crashed through a guardrail on a highway exit ramp, tipped over, and came to rest on Massachusetts state property.  <u>Id.</u> at 1.  Diesel fuel, hydraulic fluid, and scrap metal that the truck was hauling were strewn about the Commonwealth's land.  <u>Id.</u> at 1, 3.  Police asked a towing company to respond and clean up the accident scene.  <u>Id.</u> at 3.  The towing company arrived with multiple pieces of heavy equipment and removed around ten tons of scrap metal.  <u>Id.</u>  Its workers soaked up fuel from the ground, cut and removed guardrails, righted steel beams, and used cranes to right the tractor-trailer before hauling it to the towing company's facility.  <u>Id.</u>  The towing company then charged the truck's owner $150 per day for storing the vehicle.  <u>Id.</u> at 4.  The insurer paid for costs associated with remediating the diesel fuel spill, but it refused to pay other costs, arguing that the costs were not for "property damage" covered by the insurance

contract.  Id. at 4.  The towing company then sued for (among other things) breach of contract and quantum meruit.  Id. at 1-2.

The Superior Court held that the insurance contract covered the towing company's towing and recovery services, including righting and towing the tractor-trailer, loading the scrap metal into containers and hauling it away, and cleaning up the leaking chemicals.  Id. at 8, 11.  In reaching that conclusion, the Superior Court relied in part on Hazen Paper Co. v. U.S. Fid. & Guar. Co., 555 N.E.2d 576 (Mass. 1990), in which the Massachusetts Supreme Judicial Court held that "[w]hen pollution has occurred, cleanup costs are damages within the policy language because in that circumstance the word 'damages,' which is not defined in the policy, is ambiguous[,] . . . and the insured is entitled to the benefit of the [interpretation] that is more favorable to it."  555 N.E.2d at 583 (collecting cases).  Citing this analysis, the Superior Court in Buerman held "that the negligent operation of the tractor trailer . . . [that] tipp[ed] over onto another's property and deposit[ed] tons of scrap metal thereon has caused damage to that property within the meaning of the subject policy."  Docket #70-3 at 8.  The court thus found coverage for the plaintiff's towing and remediation services.  See id.  However, the court concluded that the plaintiff's storage charges "d[id] not constitute property damages under the subject policy."  Id.

Second, Sterry Street Towing, Inc. v. Gild Corp., Civ. No. BRCV2011-1176-A (Mass. Super. Ct. Jan. 9, 2013), available at docket number 70-4, also presents similar facts to the instant case.  In that case, a tractor-trailer hauling produce overturned on a ramp due to excessive speed, spilling oil, fuel, and produce onto the roadway.  Docket #70-4 at 1.  The roadway was partially blocked as a result.  Id.  Police summoned a towing company that recovered the tractor-trailer.  Id. at 1-2.  As in the instant case, "a substantial portion" of the towing company's alleged

damages arose from its use of heavy equipment to clean up the accident scene.  Id. at 3.  The insurer refused to pay the towing company, id. at 2, and argued that the company's services were not covered by the insurance contract, which covered "all sums an 'insured' legally must pay as damages because of 'bodily injury' . . . or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance, or use of covered 'autos,'" id. at 5.  As here, the policy defined property damage as including "physical injury to, or destruction of, tangible property."  Id. at 7.

Again citing Hazen, the Superior Court held "that the negligent operation of the tractor trailer . . . that tipp[ed] over onto another's property[,] obstructing passage and depositing fuel and cargo thereon[,] has caused damage to that property within the meaning of the subject policy."  Id. at 8.  As in Buerman, the court noted that "the cost to clean up a site harmed by another's negligence is a proper measure for" assessing damages.  Id. at 7-8 (citing Black v. Coastal Oil New Eng., 699 N.E.2d 353, 355 (Mass. App. Ct. 1998)).  The court again held that the towing company's storage charges were not covered by the insurance policy, but concluded that the insurance policy's property damage clause covered the towing company's "removal of the tractor-trailer, its cargo and fuel from the Commonwealth's land."  Id. at 8.

Third, an opinion of the Massachusetts Appeals Court supports the Superior Court's reasoning in Buerman and Sterry Street.  In Big Wheel Truck Sales, Inc. v. Safety Ins. Co., 81 N.E.2d 826, 2017 WL 1135944 (Mass. App. Ct. Mar. 27, 2017) (table), the court held that the insurance policy at issue did not afford coverage for a towing company's costs to recover, remove, and tow a vehicle that crashed into a ditch off the side of a road.  Id. at *1, 3.[8]  While the court did not explicitly find that the insured's driver was negligent, it noted that the undisputed

---

[8] Defendants represent that this case is the only Massachusetts appellate opinion directly on point.  See Docket #30 at 10 n.4.  The Court's research has not unearthed any others.

facts established that the accident occurred because the driver "lost control" of the vehicle.  Id. at
*1.  Analyzing a provision of the insurance policy that covered "damages to someone else
whose . . . property is damaged in an accident," the Appeals Court distinguished Buerman and
Sterry Street because "[t]he only conceivable damage supported by the record" in Safety was
"the 'loss of use'" of the insured's own vehicle—in other words, no damage to anyone else's
property had occurred—whereas the accidents in Buerman and Sterry Street caused damage to a
third party's property.  Id. at *3.  The court further noted that "[t]he mere presence . . . of [the
insured's] damaged car on the Commonwealth's property is not a loss of use so sufficient [as] to
constitute property damage" to "someone else," as the insurance policy required.  Id.

      I find Buerman, Sterry Street, and Safety persuasive and conclude that Direnzo's costs
for towing and recovery are "damages because of . . . 'property damage.'"  Docket #75-3 at 5.
Here, Kings's accident caused significant damage to public property.  The record indicates that
guard railing sustained heavy damage; a light pole fell over, leaving live power cables exposed;
hazardous fluids leaked from the truck onto the ground; and the road onto which the tractor-
trailer fell after driving off the highway was obstructed.  See Docket #50-1 at 32-33; see also
Docket #70-6 (sixty-eight photographs depicting this extensive damage and documenting
Direnzo's work).  While Defendants obviously are correct that "recovery and towing services are
not 'property damage,'" Docket #50 at 9, that assertion misses the point.  Kings's policy does not
only cover property damage per se, but also "damages because of . . . 'property damage.'"
Docket #75-3 at 5.  I find that Direnzo's towing, recovery, and remediation services fall within
"damages because of . . . 'property damage.'"

      Defendants cast Buerman and Sterry Street as inapposite because those cases contained
explicit findings of negligence by the vehicles' operators.  See Docket #75 at 6.  I reject that

15

argument.  While it is true that the Superior Court found that negligence caused the accidents in
Buerman and Sterry Street, the reason that coverage was allowed in those cases but denied in
Safety, as the Massachusetts Appeals Court made clear in Safety, was that the accidents in
Buerman and Sterry Street caused "property damage" to a third party.  Buerman and Sterry
Street thus reasoned that the defendants were legally obligated to pay the towing companies'
damages because the insureds caused property damage to a third party, not necessarily because
there was negligence.  See Docket #70-3 at 8; Docket #70-4 at 8.  Indeed, as in the instant case,
the policies in all three Massachusetts decisions did not condition coverage on a showing of
negligence.  Rather, the policies covered damages because of property damage to a third party.
See Docket #70-3 at 5; Docket #70-4 at 5; Safety Ins. Co., 2017 WL 1135944, at *3 (explaining
that the insurance policy covered "damages to someone else whose . . . property is damaged in an
accident" (omission in original)).  Massachusetts law recognizes the cost of repairing reasonably
curable property damage as an appropriate measure of damages.  See, e.g., Black, 699 N.E.2d at
355-56 (citing Belkus v. City of Brockton, 184 N.E. 812, 813-14 (Mass. Super. Ct. 1933));
accord Clean Harbors Envtl. Servs., Inc. v. Bos. Basement Techs., Inc., 916 N.E.2d 406, 411
(Mass. App. Ct. 2009) (collecting cases); cf. Hazen, 555 N.E.2d at 583 ("When pollution has
occurred, cleanup costs are damages within the policy language . . . .").[9]

    Defendants alternatively argue that the phrase "legally obligated to pay as damages"
refers to tort damages but not damages in contract, and they point to a number of federal cases so
holding in the context of commercial general-liability insurance ("CGL") policies.  See Docket

---

[9] Even if I agreed with Defendants' attempt to distinguish Buerman and Sterry Street because of their explicit
findings of negligence, that argument would not support granting Defendants' motion for summary judgment.
Whether Kings's negligence contributed to this accident presents, at a minimum, a disputed issue of material fact.
See infra section III.B.4; see also Docket #72 at 3 (reporting that Kings's driver contributed to the accident by being
"[f]atigued/asleep").

#75 at 2-3 (collecting cases); accord Mello Const., Inc. v. Acadia Ins. Co., 874 N.E.2d 1142, 2007 WL 2908267, at *3 (Mass. App. Ct. Oct. 5, 2007) (table). I do not find this argument on the meaning of "legally obligated to pay as damages" persuasive. The argument fails to advance the task at hand: to discern the policy's ordinary meaning in light of "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Gandor, 140 F. Supp. 3d at 144-45 (quotation and citation omitted). In fact, by inviting the Court to consider judicial interpretations of language in other policies, the argument ignores this task. The provision in this case that grants Kings coverage for "all sums an 'insured' legally must pay as damages because of . . . 'property damage'" simply does not contain language that limits its reach to damages in tort. Indeed, Buerman and Sterry Street involved virtually the exact same policy language as the instant case; in both, that language was held to cover the towing companies' damages for costs incurred to remediate damage to public property. Yet neither Buerman nor Sterry Street is easily characterized as sounding in tort, for in both cases, a towing company's alleged damages comprised costs for remediation services provided at the accident scene. Other courts' analyses of policies not before the Court in the instant case thus are neither helpful nor persuasive here.

Assigning the insurance contract's language its usual and ordinary meaning, and considering "what a reasonable insured, reading the relevant policy language, would expect to be covered," e.g., Hakim v. Mass. Insurers' Insolvency Fund, 675 N.E.2d 1161, 1165 (Mass. 1997), I conclude that the policy's language unambiguously covers Direnzo's claims.[10] Here, public property was damaged and rendered unusable: Southbridge Street was obstructed by the tractor-

---

[10] Of course, if the contract were ambiguous on this point, that ambiguity must be resolved in Direnzo's favor. See, e.g., Herbert H. Landy Ins. Agency, Inc., 820 F.3d at 42 (quoting Morrison, 951 N.E.2d at 671).

trailer and its expelled cargo; a street light and guard rail were damaged; fuel and other fluids leaked onto the street and presumably threatened contamination; and a live powerline was dangerously lying on the ground.  Further, this property damage indisputably was caused by Kings's accident—putting aside the question of negligence.  And Kings, the insured here, is legally responsible for Direnzo's damages for costs Direnzo incurred to remediate the public property damage.[11]

        2.      The "Covered Pollution Cost or Expense" Clause Covers Direnzo's Pollution Remediation Services

Although not discussed in the parties' briefs, a clause in the insurance contract expressly affords coverage for Direnzo's remediation of the gasoline, engine oil, antifreeze coolant, and battery acid that leaked from Kings's tractor-trailer as a result of the accident.  See Docket #50-1 at 32-33.  Namely, the policy grants coverage for "all sums [the] 'insured' legally must pay as a 'covered pollution cost or expense' to which this contract applies, caused by an 'accident' and resulting from the ownership, maintenance or use of covered 'autos'. [sic]"  Docket #75-3 at 5.  This coverage only exists when "there is either 'bodily injury' or 'property damage' to which this insurance applies that is caused by the same 'accident'. [sic]"  Id.

The contract states that the phrase "covered pollution cost or expense" includes costs or expenses from

> fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

---

[11] I also reject Defendants' general argument, not linked to any specific contractual provision, that contractual and quasi-contractual damages are not covered by the type of insurance policy at issue in this case.  See Docket #75 at 4-5.  Defendants cite two cases in support of this theory, one from Oregon's intermediate appellate court and the other from the U.S. Court of Appeals for the Ninth Circuit.  See id. (citing Or. Ins. Guar. Ass'n v. Thompson, 760 P.2d 890, 893 (Or. Ct. App. 1988); Allstate Ins. Co. v. Belezos, 951 F.2d 358, 1991 WL 275335 (9th Cir. Dec. 24, 1991) (table)).  Both cases are readily distinguishable because they applied insurance contracts to acts of intentional trespass, not a refusal to pay for services that the insurer believed excluded from an insurance policy.  See Thompson, 760 P.2d at 892; Belezos, 1991 WL 275335, at *3.

>    (1) The "pollutants" escape, seep, migrate, or are discharged, dispersed or
>    released directly from an "auto" part designed by its manufacturer to hold, store,
>    receive, or dispose of such "pollutants"; and
>
>    (2) The discharge, dispersal, seepage, migration, release, or escape of the
>    "pollutants" is caused directly by such upset, overturn or discharge [of the
>    "auto"].

Id.  This language plainly covers Direnzo's costs to remediate the various mechanical fluids and chemicals that escaped from the tractor-trailer at the accident scene.  See Docket #50-1 at 32-33; Docket #50-1 at 14 (itemizing costs for a "HAZWOPER supervisor"[12] and "HAZMAT drum[]").  Because the insurance contract's plain language covers these costs, to the extent that Defendants dispute coverage for pollution remediation services,[13] I recommend that Defendants' motion for summary judgment be denied.

### 3.    Policy Exclusions

Defendants also argue that three exclusions within the policy proscribe coverage for Direnzo's services.  See Docket #50 at 14-17.  In response, Direnzo briefly argues in the abstract that public policy considerations support its position and devotes one sentence to arguing, as a general matter, that the exclusions in insurance contracts do not preclude liability "for contractual liability legally incurred by the insured in response to an accident."  Docket #70 at 19 (citations omitted).

I do not take up Direnzo's underdeveloped categorical arguments.  Cf. Medina-Rivera v. MVM, Inc., 713 F.3d 132, 140-41 (1st Cir. 2013) (quoting Town of Norwood v. Fed. Energy

---

[12] The acronym HAZWOPER refers to the Hazardous Waste Operations and Emergence Response Standard.  See Frequently Asked Questions: HAZWOPER, U.S. Dep't of Labor, https://www.osha.gov/html/faq-hazwoper.html (last visited Mar. 7, 2018).

[13] The record indicates that Defendants have paid other contractors for pollution remediation services at the accident scene.  See Docket #70-8 at 1-2 (documenting a $1,001.06 payment to Transportation Spill Solutions for "HAZMAT"); Docket # 70-9 at 1-2 (documenting a $16,014.68 payment to New England Disposal Technologies for "HAZMAT"); Docket #70-11 at 1-2 (documenting a $3,993.80 payment to Williams Environmental Services for "HAZMAT").

Regulatory Comm'n, 202 F.3d 392, 405 (1st Cir. 2000)) (citing Muñiz v. Rovira, 373 F.3d 1, 8 (1st Cir. 2004)) (warning that "developing a sustained argument out of . . . legal precedents" is a party's job and that "undeveloped arguments" are deemed waived).  Instead, I assess the contested contractual exclusions sequentially.

> i.   The Contractual Liability Exclusion and "Assume No Obligation" Condition Do Not Exclude Direnzo's Costs

I begin by applying two policy provisions that precluded coverage for certain liability assumed by Kings to a third party.  The first, labeled an exclusion, precluded coverage for any "[l]iability assumed under any contract or agreement."  Docket #75-3 at 7.[14]  The second, labeled a "loss condition," id. at 10, instructed that in the event of an accident, claim, suit, or loss, Kings must "[a]ssume no obligation, make no payment [and] incur no expense without [the insurer's] prior written consent, except at [Kings's] own cost."  Id. at 11.  Defendants argue that both provisions defeat Direnzo's claims.  I analyze the provisions together.

As noted above, it is Defendants' burden to show that a policy exclusion precludes coverage.  See New Fed. Mortg. Corp., 543 F.3d at 11 (citing Talhouni, 604 N.E.2d at 692).  I find that Defendants have failed to show that either provision applies here, as there is no evidence that Kings assumed liability under a "contract or agreement" with Direnzo or assumed an obligation, made a payment, or incurred an expense to Direnzo.  Rather, the record shows that the Worcester Police Department summoned Direnzo to the accident scene and directed Direnzo's workers to recover and haul away Kings's tractor-trailer and to otherwise repair damage to public property.  Nor does the record contain any evidence that Kings's driver

---

[14] This exclusion did not apply to liability "[t]hat the 'insured' would have in the absence of the contract or agreement."  Docket #75-3 at 7.  Nor did it apply to certain liability assumed pursuant to an "insured contract"—a provision not at issue here.  Docket #75-3 at 7; see also id. at 16-17 (defining "insured contract").

authorized the engagement of Direnzo.  To the contrary, the record indicates that the driver was incapacitated by the accident and was taken by ambulance to a local hospital.  See Docket #72 at 1, 3.  Defendants thus have failed to shoulder their burden to show that the contractual liability exclusion or the "assume no obligation" condition applies.

Additionally, I find that neither provision bars recovery insofar as Direnzo seeks damages in quasi-contract.  Those damages do not arise from a "contract or agreement," but rather sound in equity.  "[A] 'quasi-contract' is not a contract at all, but an obligation imposed by the court to bring about justice and equity, without regard to the intent of the parties and without regard to whether they have an agreement . . . ."  1 Williston on Contracts § 1:6 (4th ed.) (May 2017 update).  The quasi-contractual claims in this case also do not rest upon any action taken by Kings to assume an obligation, make a payment, or incur an expense to Direnzo, which responded to the accident scene at the Worcester Police Department's request.  Accordingly, I find that neither the contractual liability exclusion nor the "assume no obligation" condition applies to Direnzo's claims for unjust enrichment or quantum meruit.

ii.   The "Care, Custody, or Control" Exclusion Does Not Preclude Coverage for Direnzo's Costs

Next, the policy's "care, custody or control" exclusion barred coverage for "'[p]roperty damage' to or [a] 'covered pollution cost or expense' involving property owned or transported by the 'insured' or [in] the 'insured's' care custody or control."  Docket #75-3 at 8.[15]  Defendants submit that this provision precludes coverage for damage to property of which the insured was "in charge" or over which the insured "exercised dominion or control" at the time the damage occurred.  See Docket #50 at 16 (citing Trs. of Tufts Univ. v. Comm. Union Ins. Co., 616 N.E.2d 68 (Mass. 1993); Crane Serv. & Equip. Corp. v. U.S. Fid. & Guar. Co., 496 N.E.2d 833 (Mass.

---

[15] Kings's policy is not a model of clarity.  As written, the provision is missing both bracketed words.

App. Ct. 1986)).  In their view, because Kings exercised dominion or control over its tractor-trailer when the tractor-trailer sustained damage in the accident, this provision excludes coverage for Direnzo's services.

I disagree.  Defendants' argument misapprehends the nature of Direnzo's claims. Direnzo does not seek coverage arising from damage to Kings's property, but rather seeks compensation for its costs to remediate the extensive damage to public property.  Indeed, even Direnzo's costs incurred to recover and tow Kings's vehicle were not undertaken for Kings's sake or at Kings's direction, but instead to clear Southbridge Street and the surrounding area of the wreckage that Kings's accident created.  Direnzo was summoned to the accident scene not by Kings, but by the Worcester Police Department, which directed Direnzo "to safely recover and clean up the spillage of the accident scene."  Docket #50-1 at 32.  Further underscoring this point, Direnzo never remediated any damage to Kings's tractor-trailer, which remains in the same (or worse) condition than immediately after the accident occurred.

This crucial distinction between the damage to public property and the damage to Kings's property is consistent with the analogous Massachusetts cases discussed above.  The Superior Court in Buerman and Sterry Street found coverage precisely because in those two cases "there was documented property damage" to a third party's property "in the form of debris strewn on the roadway."  Safety Ins. Co., 2017 WL 1135977, at *3 (describing Buerman and Sterry Street). Conversely, the Massachusetts Appeals Court in Safety held that "[t]he mere presence" of a "damaged car on the Commonwealth's property" did not constitute "property damage" to a third party, but instead amounted only to property damage to the insured.  Id.  Here, it is the damage to public property that brings Direnzo's services within the ambit of Kings's insurance policy.  And because Kings neither owned nor exercised dominion or control over the damaged public

property that Direnzo remediated here, the insurance policy's "care, custody, or control"

exclusion does not apply to Direnzo's claims.

       iii.    The "No Benefit to Bailee" Condition Precludes Coverage for
                Direnzo's Storage Services, but Not Direnzo's Other Costs

Finally, the policy contains a provision, labeled a "general condition[],"entitled "No

Benefit to Bailee – Physical Damage Coverages."  Docket #75-3 at 11-12.[16]  It provides: "We

will not recognize any assignment or grant any coverage for the benefit of any person or

organization holding, storing or transporting property for a fee regardless of any other provision

of this Coverage Form."  Id.  Defendants again submit that this provision bars coverage for

Direnzo's claims.  See Docket #50 at 17.  Again, it is Defendants' burden to show that this

exclusionary language applies.  New Fed. Mortg. Corp., 543 F.3d at 11 (citing Talhouni, 604

N.E.2d at 692).

Defendants' four-sentence argument respecting this provision is near-undeveloped.  See

Docket #50 at 17; cf. Medina-Rivera, 713 F.3d at 140-41 (quoting Town of Norwood, 202 F.3d

at 405) (citing Muñiz, 373 F.3d at 8) (warning that "developing a sustained argument out of . . .

legal precedents" is a party's job and that "undeveloped arguments" are deemed waived).  One of

Defendants' two citations merely recites the definition of a bailment.  See Goudy & Stevens, Inc.

v. Cable Marine, Inc., 924 F.2d 16, 17-18 (1st Cir. 1991) (affirming the denial of summary

judgment where a sports fishing yacht sank while bailed to the defendant).  The other applies the

same contractual language as contained in Kings's policy, but does so in the context of rental

cars that were crashed, stolen, or vandalized.  See Commerce Ins. Co. v. Empire Fire & Marine

Ins. Co., 879 N.E.2d 1272, 1273, 1276 (Mass. App. Ct. 2008) (citation omitted) (concluding that

---

[16] While this condition's title references a "[b]ailee," the policy instructs that titles "shall in no way be deemed to limit [the insurer's] rights or modify any language."  Docket #75-3 at 19.  Aside from its title, the condition does not reference a bailor, bailee, or bailment.

"the 'No Benefit [t]o Bailee' clause removes the renter-drivers from the class of [the defendant's] insured" (first alteration in original)).  These citations do not suffice to prove that the "no benefit to bailee" condition precludes coverage for Direnzo's damages.

Second, the exclusion refers to a person or organization "holding, storing or transporting property for a fee"; but the policy does not contain a definition of "property."  It is thus unclear whether "property" encompasses Kings's tractor-trailer, the cargo Kings was transporting, the personal property of Kings's driver, or some combination of these.  The absence of a definition of "property" generates ambiguity that the Court must resolve in Direnzo's favor.  See Hazen Paper Co. 555 N.E.2d at 583 (citations omitted) (holding that because the insurance policy did not define the term "damages," "the insured is entitled to the benefit of the [interpretation] that is more favorable to it").  For this additional reason, I find that the "no benefit to bailee" condition does not apply.

I note, though, insofar as the policy's coverage for "damages because of . . . 'property damage'" does not include Direnzo's costs to store Kings's tractor-trailer at Direnzo's facility— as I conclude above, see supra section III.B.1—to the extent that Direnzo's storage of the tractor-trailer constitutes "storage . . . [of] property for a fee," the objective of this condition is achieved.

*          *          *

In summary, I find as a matter of law that the underlying policy covers Direnzo's costs to recover and tow Kings's tractor-trailer and to remediate the accident scene.  Accordingly, as to all those costs, I recommend that Defendants' motion be denied.  Further, noting that Direnzo's opposition brief requests declaratory relief in Direnzo's favor, see Docket #70 at 21, and finding that Defendants have "had an adequate opportunity to show that there is a genuine issue [of material fact] and that [their] opponent is not entitled to judgment as a matter of law," I

recommend that the Court enter summary judgment in Direnzo's favor <u>sua sponte</u> as to

Direnzo's towing, recovery, and remediation costs.  <u>Nat'l Expositions, Inc.</u>, 824 F.2d at 133-34

(quoting 10A C. Wright, A. Miller & M. Kane, <u>Federal Practice and Procedure</u> § 2720, at 34)

(emphasis omitted) (collecting cases); <u>see</u> Fed. R. Civ. P. 56(f)(1).

 I also find as a matter of law that the underlying policy does not cover Direnzo's costs to

store Kings's tractor-trailer at Direnzo's facility.  As to those costs, I therefore recommend that

Defendants' motion be granted.

    4.  The MCS-90 Endorsement Presents a Disputed Question of Material Fact

 I now turn to the MCS-90 Endorsement attached to Kings's insurance policy.  As

explained below, coverage under this endorsement is triggered only if underlying policy does not

cover Direnzo's claims.  Because I find that the underlying policy does cover Direnzo's claims

for damages arising from its towing, recovery, and remediation services, I address the scope of

the MCS-90 endorsement only in the interest of completeness.

 The endorsement provides, in relevant part,

> [T]he insurer (the company) agrees to pay, within the limits of liability described
> herein, any final judgment recovered against the insured for public liability
> resulting from negligence in the operation, maintenance or use of motor vehicles
> subject to the financial responsibility requirements of Sections 29 and 30 of the
> Motor Carrier Act of 1980 . . . .  It is understood and agreed that no condition,
> provision, stipulation, or limitation contained in the policy, this endorsement, or
> any other endorsement thereon, or violation thereof, shall relieve the company
> from liability or from the payment of any final judgment, within the limits of
> liability herein described.

Docket #75-3 at 1.  "Public [l]iability means liability for bodily injury, property damage, and

environmental restoration."  <u>Id.</u>  In turn, "property damage" is defined as "damage to or loss of

use of tangible property"; and "environmental restoration" includes "the cost of removal and the

cost of necessary measures taken to minimize or mitigate damage to human health, the natural

environment, fish, shellfish, and wildlife." Id.  If the insured fails to pay a final judgment to which the endorsement applies, a judgment creditor may sue the insurer "in any court of competent jurisdiction" in order to compel payment.  Id.  This "peculiar" endorsement thus "grants the judgment creditor the right to demand payment directly from the insurer . . . ."  Canal Ins. Co. v. Underwriters at Lloyd's London, 435 F.3d 431, 442 n.4 (3d Cir. 2006).[17]

"The operation and effect of the MCS-90 endorsement is a matter of federal law."  Canal Ins. Co. v. Distrib. Servs., Inc., 320 F.3d 488, 492 (4th Cir. 2003) (collecting cases); see Canal Ins. Co. v. Carolina Cas. Ins. Co., 59 F.3d 281, 282-83 (1st Cir. 1995) (discussing an "ICC endorsement"); see also Lynch v. Yob, 768 N.E.2d 1158, 1161 n.2 (Ohio 2002) ("An MCS-90 endorsement is often referred to as an ICC endorsement . . . .").  This endorsement does not modify the underlying insurance policy; rather, it creates a "suretyship by the insurance carrier to protect the public—a safety net[,] but not insurance[,] . . . [that] simply covers the public when other coverage is lacking."  Carolina Cas. Ins. Co., 59 F.3d at 283.  This surety obligation thus "is triggered only when . . . the underlying insurance policy to which the endorsement is attached does not otherwise provide coverage . . . ."  Carolina Cas. Ins. Co. v. Yeates, 584 F.3d 868, 878 (10th Cir. 2009) (collecting cases).  So if the policy itself covers Direnzo here, then the MCS-90 endorsement does not.

Defendants argue that the endorsement does not cover Direnzo's claims by focusing on the endorsement's language describing a "final judgment . . . for public liability resulting from negligence."  Docket #75-3 at 1.  They emphasize that Direnzo's state-court suit, and hence the judgment, against Kings contained no negligence claim, and they cast this fact as fatal to

---

[17] In language not currently at issue, the MCS-90 endorsement also "grants the insurer the right to demand reimbursement from the insured."  Canal Ins. Co. v. Underwriters at Lloyd's London, 435 F.3d 431, 442 n.4 (3d Cir. 2006).

Direnzo's argument that the endorsement applies. <u>See</u> Docket #50 at 13-14. In opposition, Direnzo acknowledges that the endorsement only covers a final judgment imposing "liability resulting from negligence," but submits that whether Kings's liability to Direnzo resulted from Kings's negligence presents a disputed question of material fact. Docket #70 at 18.[18]

The parties' arguments boil down to a disagreement over whether the phrase "resulting from negligence" modifies "final judgment"—requiring that Direnzo's state-court judgment against Kings impose negligence liability—or instead modifies "public liability"—affording coverage for Direnzo's claims if Direnzo can prove that its damages resulted from Kings's negligence. The parties have not cited, and the Court has not found, case law resolving this question.

Interpreting the endorsement's plain language, I find that the MCS-90 covers a final judgment that imposes liability resulting from the insured's negligence—not merely a negligence judgment entered against the insured. Accordingly, if Direnzo proves in this action that its damages in the form of remediation costs it incurred resulted from Kings's negligence, then Kings's liability to Direnzo would "result[] from . . . negligence" within the meaning of the MCS-90 endorsement such that the endorsement would apply.

The endorsement's history and purpose support this interpretation. "It is well established that the primary purpose of the MCS-90 endorsement is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers." <u>Forkwar v. Progressive N. Ins. Co.</u>, 910 F. Supp. 2d 815, 824 (D. Md. 2012) (quoting <u>Distrib. Servs., Inc.</u>, 320 F.3d at 490); <u>accord</u> 9A Steven Plitt et al., <u>Couch on Insurance</u> § 132:54 (3d ed.) (Dec. 2017

---

[18] Alternatively, Direnzo contends that the doctrine of <u>res ipsa loquitur</u> should apply to Kings's accident. Docket #70 at 18-19. Because I find that there exists a disputed question of material fact as to Kings's negligence, I decline to address this argument.

Update) (collecting cases).  The endorsement is mandated by a regulation promulgated by the

Secretary of Transportation pursuant to the Motor Carrier Act of 1980, Pub. L. No. 96-296, 94

Stat. 793 (the "MCA").[19]  See, e.g., Forkwar, 910 F. Supp. 2d at 824.  Congress enacted the

relevant provisions of the MCA to address abusive practices in the trucking industry through

which motor carriers would "avoid financial responsibility for accidents that occurred while

goods were being transported in interstate commerce."  Distrib. Servs., Inc., 320 F.3d at 489

(citing Pierre, 784 N.E.2d 52).  To that end, "[t]he purpose of the[] regulations [requiring the

MCS-90 endorsement] is to create additional incentives to motor carriers to maintain and operate

their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of

financial responsibility for motor vehicles operated on public highways."  49 C.F.R. § 387.1.

Interpreting the MCS-90 endorsement as providing coverage here advances these policy goals:

Direnzo incurred significant costs to repair and remediate damage to public property that resulted

from Kings's negligence; Kings's insurer should be accountable for the costs of the damage to

public property.

Construing the record in Direnzo's (i.e., the non-movant's) favor, as I am obligated to do

on a motion for summary judgment, see LeBlanc, 6 F.3d at 841, Defendants have not shown as a

matter of law that Kings's liability to Direnzo did not result from Kings's negligence.  To the

contrary, the record indicates that negligence may well have caused the accident from which

Direnzo's costs arose.  As discussed above, a police report documenting the accident notes that

Kings's driver contributed to the accident by being "[f]atigued/asleep."  Docket #72 at 1.  The

report also notes that the tractor-trailer was "[t]raveling [s]traight ahead" on a "lighted roadway"

---

[19] More precisely, the MCS-90 endorsement is one of three means by which certain motor carriers must establish
compliance with regulatory requirements respecting financial responsibility.  The other two options are a surety
bond and self-insurance.  See 49 C.F.R. § 389.7(d).  Those options are not at issue in this case.

in "[c]lear" and "[d]ry" conditions when it "[r]an off road right" in a "[s]ingle [v]ehicle [c]rash." Id.  As part of the police investigation into the accident, Kings's driver received a written warning for a "marked lanes violation."  Id. at 3.  This evidence suffices to create a disputed question of material fact as to Kings's negligence.  Insofar as Direnzo seeks payment pursuant to the MCS-90 endorsement for public liability imposed by its state-court judgment against Kings, Defendants' motion for summary judgment should therefore be denied.

That said, the MCS-90 endorsement does not cover Direnzo's damages arising from its storage of Kings's tractor-trailer.  As set forth above, the endorsement only covers final judgments that impose public liability.  "Public liability" is defined as "liability for bodily injury, property damage, and environmental restoration."  Docket #75-3 at 1.  Direnzo's storage costs do not fall within any of these three categories.  First, they plainly do not arise from bodily injury. Second, they also do not constitute environmental restoration—which the endorsement defines as "restitution for the loss, damage, or destruction of natural resources" caused by "the accidental discharge, dispersal, release or escape . . . of any commodity transported by a motor carrier."  Id. And third, I have determined above that Direnzo's storage costs, unlike its damages for towing, recovery, and remediation, are not damages arising from property damage.  The endorsement thus does not afford coverage for Direnzo's costs to store the tractor-trailer at Direnzo's facility.

I acknowledge that Direnzo could not have obtained a final negligence judgment against Kings in Superior Court had it attempted to do so.  Nonetheless, for the reasons set forth above, I agree with Direnzo that the MCS-90 endorsement could cover its claims in this action, provided that Direnzo can prove that Kings's accident resulted from Kings's negligence.  I therefore recommend that Defendants' motion for summary judgment as to the endorsement be denied.

C.    Direnzo's Reach and Apply Claims

Defendants also move for summary judgment on Direnzo's reach and apply claims.  But Judge Hillman's scheduling order constrains the parties only to argue their competing declaratory judgment claims at this stage.  See Docket #26.  Direnzo's reach and apply claims thus are not presently before the Court, and I therefore decline to address them.

D.    Direnzo's Chapter 93A Claim

Defendants also seek summary dismissal of Direnzo's Chapter 93A claim.  Pursuant to that claim, Direnzo seeks, among other things, multiple damages, attorney's fees, and costs.  See Docket #12 at 13-14.

Chapter 93A renders unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A § 2.  As Direnzo notes, in the insurance context, this includes "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds."  Mass. Gen. Laws ch. 176D § 3(9)(g) (defining "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance").  However, an insurer who clearly articulates a good-faith defense when denying a claim of coverage does not violate Chapter 93A.  E.g., Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40-41 (1st Cir. 2000) (quoting Gulezian v. Lincoln ins. Co., 506 n.E.2d 123, 127 (Mass. 1987)) (citing Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 56 (1st Cir. 1998)).

While my recommendation to grant in part and deny in part Defendants' summary judgment motion may inform the ultimate resolution of Direnzo's Chapter 93A claim, I believe it is prudent to reserve decision on that claim until a more complete record is available.  I therefore

recommend that Defendants' motion as to Direnzo's Chapter 93A claim be denied without prejudice.[20]

E.      Direnzo's Claims Against OOSI and OOIDA

Finally, Defendants move for dismissal of Direnzo's claims against OOSI and OOIDA. Defendants argue that these two defendants are not insurers, are separate entities from RRG, and had no relationship with Direnzo from which liability in this action could arise. See Docket #50 at 8-9. Defendants rely on the affidavit of Kurt Moegle, a Claim Manager for a contractor that provides services for OOIDA members, to this effect. See Docket #51 ¶¶ 1, 10-11.

Direnzo has responded with three arguments against dismissal of its claims against OOSI and OOIDA. First, Direnzo points to documents submitted with Defendants' motion papers that contain numerous references to OOSI and OOIDA. See Docket #70 at 7. Second, Direnzo impugns the affidavit on which Defendants rely, noting that a claim manager associated with RRG cannot attest to the structures of the other two defendants or to the relationships among the three defendants. Id. And third, Direnzo points out that District Judge Hillman's scheduling order has prevented it from conducting discovery concerning the relationships between RRG, OOSI, and OOIDA. Id. at 6-7.

I agree with Direnzo that Defendants' motion as to OOSI and OOIDA is premature. Direnzo has not yet been able to investigate those parties' roles respecting the insurance policy due to Judge Hillman's scheduling order limiting the parties to discovery on their declaratory judgment claims. See Docket #29. Accordingly, I recommend that the Court deny without prejudice summary judgment as to OOSI and OOIDA pending further discovery.

---

[20] To the extent that Direnzo seeks an award of attorney's fees in connection with opposing the instant motion, see Docket #70 at 21, I recommend that the Court deny that request.

**Conclusion**

For the reasons set forth above, I RECOMMEND that Defendants' Motion for Summary Judgment, Docket #49, be GRANTED IN PART AND DENIED IN PART as follows:

1.  The motion is GRANTED insofar as I find that the policy does not cover any storage cost incurred by Direnzo once Kings's tractor-trailer was deposited at Direnzo's secure facility.

2.  The motion is DENIED insofar as I find that the policy covers all damages for costs Direnzo incurred for the recovery and towing of Kings's tractor-trailer and for the remediation of all other property damage at the accident scene.  Because I resolve this question as a matter of law, I recommend that summary judgment respecting these damages be GRANTED SUA SPONTE in Direnzo's favor.

3.  Should the District Court reject the foregoing, necessitating consideration of the MCS-90 endorsement, the motion is DENIED insofar as I find that coverage under the MCS-90 endorsement raises a genuine dispute of material fact.

4.  The motion is DENIED WITHOUT PREJUDICE as to Direnzo's Reach and Apply claim, Chapter 93A claim, and claims against OOSI and OOIDA.[21]

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[21] The parties are notified that any party who objects to these proposed findings and recommendations must file a written objection thereto within fourteen days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portions of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72(b)(2).  The U.S. Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this rule waives the right to review of this Report and Recommendation in the District Court and precludes appellate review of the District Court's order based on this Report and Recommendation.  E.g., Brenner v. Williams-Sonoma, Inc., 867 F.3d 294, 297 n.7 (1st Cir. 2017) (citation omitted); Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168-69 (1st Cir. 2016) (citations omitted); see also Thomas v. Arn, 474 U.S. 140 (1985).